**UNITED STATES of America**

**v.**

**John Heffron SISSON, Jr.**

**Crim. No. 68–237.**

United States District Court
D. Massachusetts.

Dec. 11, 1968.

See also D.C., 294 F.Supp. 511, 515.

Paul F. Markham, U. S. Atty., John Wall, Asst. U. S. Atty., for plaintiff.

John G. S. Flym, Boston, Mass., for defendant.

### OPINION

WYZANSKI, Chief Judge.

In his memorandum of points and authorities at pages 9 and 10, defendant lists the following as being matters as to which he proposes to tender evidence:

"1. 'The United States claim to be acting in "collective self-defense" on behalf of South Vietnam is contrary to the well-established meaning of the

rule laid down in Article 51 of the United Nations Charter to define the situations in which the right of collective self-defense may be lawfully exercised.

2. The United States military intervention in Vietnam therefore also violates the fundamental prohibition of the use of force proclaimed in Article 2(4) of the Charter as a Principle of the United Nations.

3. The United States has refused for more than a decade to abide by the basic Charter obligation contained in Article 33(1) to seek the settlement of international disputes by peaceful means.

4. The United States has refused to make proper use of the elaborate machinery created by the Geneva Accords of 1954 for the purpose of preventing any improper developments in Vietnam. The United States, furthermore, abetted and supported the systematic disregard of these obligations by the Saigon regime.

5. The State Department contends that an armed attack by North Vietnam upon South Vietnam occurred before February 7, 1965, the date on which the United States started overt war actions. This contention itself implies that the use of force by the United States in Vietnam during the four-year period between 1961 and early 1965 was illegal. The State Department agrees with the position of this analysis that armed attack must have taken place to justify the use of force by the United States under the principle of "collective self-defense."

6. In February 1965, when the United States started war actions against North Vietnam, the United States formally declared that these war actions constituted reprisals. Under the rules of international law governing the right of reprisal, these war actions must be regarded as illegal reprisals.

7. The United States abetted the breach of the central provision of the Geneva Accords of 1954 by South Vietnam, namely, the obligation to hold nationwide elections under international supervision looking toward the reunification of the Southern and Northern zones of Vietnam under a single government.

8. The United States also contravened other basic provisions of the Geneva Accords of 1954 by fostering a foreign military build-up in Vietnam and by virtually bringing South Vietnam into a military alliance.

9. The presence of large United States military forces in South Vietnam and the introduction of military equipment into South Vietnam has violated those provisions of the Geneva Accords which prohibit any foreign military build-up in South Vietnam. This conclusion has been confirmed by findings of the ICC.

10. The war actions of the United States in South Vietnam are not authorized by the SEATO Treaty, but, in fact, appear to be in violation of it.

11. Even if the United States were legally entitled to take war actions in Vietnam, its methods of warfare would still be illegal insofar as they have violated the rules and customs of warfare.' "

Defendant indicates that to support his contention he will offer the evidence of two academic persons of undoubted distinction: Richard A. Falk, Milbank Professor of International Law, Princeton University, and Stanley Hoffman, Professor of Government and International Law, Harvard University.

One of the important questions which this Court must consider is whether such undoubtedly expert persons are suitable as witnesses called to the stand to give testimony before a jury or other trier of fact.

Much misunderstanding of the theoretical basis of expert witnesses has followed from undoubted differences in practice in different courts.

■ 1. Expert opinion may properly be cited by either trial or by appellate

courts to support the reasonableness of an act passed by a legislature if that act is challenged under the due process or other clause of the Constitution. Mr. Brandeis, as he then was, in Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, if he did not originate the use of expert opinion to support the reasonableness of a legislative act, at least deserves credit for making the practice respectable. But two points are to be noted. First, expert evidence of the Brandeis brief type is offered not from the witness stand, but from the counsel table as written argument. Second, the expert evidence is used to support the reasonableness of the legislation and is not used either to contradict it or to achieve a quite independent non-legislative judgment of fact. See Wyzanski, "A Trial Judge's Freedom and Responsibility", 65 Harv.L.Rev. 1281, 1295–1296.

2. Appellate and trial courts have on occasion utilized expert opinion not in support of a legislative judgment but to invalidate a legislative judgment on the ground that it was unreasonable. This was conspicuously true with respect to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R. 2d 1180, in which expert opinion was used in the Supreme Court of the United States to invalidate local ordinances segregating school children according to race. This was a heterodox step because some of the authorities relied upon by the Supreme Court of the United States were, so far as appears, persons whose expert testimony was not given at the trial stage to the judge or to the jury and, to a large extent, was not included within the materials formally submitted as briefs by the opposing parties. Note, Social and Economic Facts—Appraisal of Suggested Techniques for Presenting Them to the Courts, 61 Harv.L.Rev. 692, 697, note 43. Wyzanski, supra, p. 1296. Whether a different method justifies the use of expert opinion to invalidate a statute presents problems not now considered.

3. A trial court may properly accept expert testimony with respect to certain types of primary facts which have already been admitted in evidence as testimony by witnesses who themselves made relevant observations of primary facts. The applicable general rules are admirably restated in the A.L.I. Model Code of Evidence, ch. V, §§ 401–410, which reflects an independent re-examination of 2 Law and Contemporary Problems 401–527, 2 Wigmore, Evidence (3d ed. 1940) § 563, and a Uniform Act proposed in 1937 by the National Conference of Commissioners on Uniform State Laws. A common case in the trial courts is where a doctor is called to testify as to his expert medical opinion as to whether the primary facts already in evidence support an inference of causation or support a particular diagnosis or prognosis. Perhaps the most extreme example of expert medical testimony so far sanctioned was the ruling by Judge Goddard in the second trial of United States v. Hiss, 88 F.Supp. 559 (S.D.N.Y.) permitting Dr. Binger and Dr. Murray to express a psychiatric opinion of the credibility of the witness Whittaker Chambers. A more familiar use of expert opinion is where an expert real estate appraiser testifies in a valuation case as to his opinion of the value of property, the characteristics of which have been independently proved either by his or other persons' observations.

4. A closer case which commonly arises in the trial court involves the testimony of an expert in patent cases. Probably because most judges find the subject of patents difficult to understand, and because the question of invention is a mixed question of fact and of law, it is usual for the parties in a patent infringement litigation to offer expert testimony which goes beyond a description of what has been observed and which tends in most instances to involve an opinion on such questions as the amount of advance over the prior art. Such questions involve not merely observations and factual inferences, but mixed factual

and legal conclusions or steps in the process of such conclusions.

5. A variety of the preceding situation with respect to patents is the use by a trial judge of a court-appointed expert who undertakes, almost like a master, to review the whole of the evidence offered or to be offered by the plaintiff and the defendant and to express as a witness on the stand his opinion, subject to cross-examination, as to whether the patent is valid and whether it has been infringed. See A.L.I. Model Code of Evidence, §§ 405–407. My own experience in the unreported case of McMillan Laboratory, Incorporated v. Emerson and Cuming, Inc., (D.Mass.), C.A. 58–617–W, is recited in Wyzanski, "The Law of Change", New Mexico Quarterly, Spring 1968, pp. 19–20.

■ 6. With respect to copyright cases, proper practice permits a party to put on the witness stand, before the jury or other trier of fact, an expert to aid the trier of facts to analyze supposed similarities between the copyrighted work and the alleged infringing work. Arnstein v. Porter, 154 F.2d 464, 484 (2d Cir.). But it is improper to permit the expert to testify as to illicit copying or unlawful appropriation. Ibid. Even where it is proper to allow expert testimony on supposed similarities, the matter may be so obvious, to the trier of facts, either as to similarities or dissimilarities, (the usual situation with regard to literature though often not as to music,) that sound policy leads a judge, as a matter of discretion, to reject expert testimony and to permit the expert opinion to appear only as part of and as a source of counsel's argument. Nichols v. Universal Pictures Corporation, 45 F.2d 119, 122 (2d Cir.); Burns v. Twentieth Century-Fox Corporation, 75 F.Supp. 986 (D.Mass.). Judge Learned Hand, perhaps the wisest and most experienced of copyright judges, said in the *Nichols* case at p. 122, where there had been protracted use of expert testimony,

"We cannot approve the length of the record, which was due chiefly to the use of expert witnesses. Argument is argument whether in the box or at the bar, and its proper place is the last. The testimony of an expert upon such issues, especially his cross-examination, greatly extends the trial and contributes nothing which cannot be better heard after the evidence is all submitted. It ought not to be allowed at all; and while its admission is not a ground for reversal, it cumbers the case and tends to confusion, for the more the court is led into the intricacies of dramatic craftsmanship, the less likely it is to stand upon the firmer, if more naive, ground of its considered impressions upon its own perusal. We hope that in this class of cases such evidence may in the future be entirely excluded, and the case confined to the actual issues; that is, whether the copyrighted work was original, and whether the defendant copied it, so far as the supposed infringement is identical."

■ 7. In the instant case, defendant seeks to argue before a jury what is essentially a question of law, that is, whether the actions of the United States executive and military authorities are a breach of international obligations undertaken by the United States in the form of treaties, or memberships in international organizations, or other arrangements having the force of international law. It would be entirely too clear for argument that this is entirely improper (see Thayer, A Preliminary Treatise on Evidence, p. 202; Commonwealth v. Sullivan, 146 Mass. 142, 15 N. E. 491; for a comment on *Sullivan* see Mark DeWolfe Howe, Justice Oliver Wendell Holmes, Vol. II, p. 200) were it not for a suggestion which has recently gained currency (see Joseph L. Sax, Conscience and Anarchy: The Prosecution of War Resisters, The Yale Review, Vol. LVII, June 1968, No. 4, p. 481) that in criminal law cases of a certain type, particularly those which raise issues of constitutional liberty, the defendant has the right to address not merely the judge, but also the jury in order to get the

jury's view of constitutional law. The contention is, in effect, that just as in libel law as a result of Fox's Libel Act, juries were permitted to acquit a defendant if they believed that as applied to him the law was unfair, or if they did not like the view of the law given by the judge in his charge to the jury, so in constitutional cases involving civil liberty a jury should have a right on their unfettered view of the law to acquit the defendant. Up to now it has not been thought that today in the United States Courts it is appropriate for a jury, even in a constitutional case, to have any concern with the law, except to apply it as instructed by the judge. Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343. The history of the topic is brilliantly surveyed by Mark DeWolfe Howe in Juries As Judges Of Criminal Law, 52 Harv.L.Rev. 582. Of course, we all know that in certain cases where political issues run high, juries in the privacy of the jury room vote their political convictions and disregard a judge's instructions. As Judge Learned Hand said in United States ex rel. McCann v. Adams, 126 F.2d 774, 775–776 (2d Cir.),

" * * * The institution of trial by jury—especially in criminal cases— has its hold upon public favor chiefly for two reasons. The individual can forfeit his liberty—to say nothing of his life—only at the hands of those who, unlike any official, are in no wise accountable, directly or indirectly, for what they do, and who at once separate and melt anonymously in the community from which they came.. Moreover, since if they acquit their verdict is final, no one is likely to suffer of whose conduct they do not morally disapprove; and this introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions. A trial by any jury, however small, preserves both these fundamental elements and a trial by a judge preserves neither, at least to anything like the same degree."

In this case defendant is seeking, by tendering Professors Falk and Hoffman as witnesses, to broaden the defenses available in a trial which has constitutional implications. He seeks precisely the same latitude that in the 18th Century Erskine and Fox did in libel law. But if any such latitudinarian position is to be taken, it surely first should be sanctioned by the Supreme Court of the United States and not introduced into the law by a district judge.