417 F.2d 1002
 UNITED STATES of America, Appellee,
v.
Mary MOYLAN, Appellant.
UNITED STATES of America, Appellee,
v.
Philip BERRIGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas LEWIS, Appellant.
UNITED STATES of America, Appellee,
v.
George J. MISCHE, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas MELVILLE, Appellant.
UNITED STATES of America, Appellee,
v.
Marjorie MELVILLE, Appellant.
UNITED STATES of America, Appellee,
v.
John HOGAN, Appellant.
UNITED STATES of America, Appellee,
v.
James DARST, Appellant.
UNITED STATES of America, Appellee,
v.
Daniel BERRIGAN, Appellant.
 Nos. 12988-12996.
 United States Court of Appeals Fourth Circuit.
 Argued June 10, 1969.
 Decided October 15, 1969.
 
 William M. Kunstler, New York City, (Harold Buchman, Fred Weisgal, Baltimore, Md., Robert R. Drinan, William C. Cunningham, Harrop A. Freeman on brief), for appellants.
 Barnet D. Skolnik, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF and WINTER, Circuit Judges.
 SOBELOFF, Circuit Judge:
 
 
 1
 The defendants appeal their conviction in the United States District Court for the District of Maryland for violation of three federal statutes proscribing the mutilation of Government records, destruction of Government property and interference with the administration of the Selective Service System.[1] The facts are uncontroverted. At 12:50 P.M. on May 17, 1968, the appellants entered the office of Local Board No. 33 in Catonsville, Maryland and removed approximately 378 I-A, I-Y and II-A files to an adjacent parking lot where they burned the files with homemade napalm. The appellants, men and women with sincere and strong commitments, readily admit the commission of these acts as a protest against the war in Vietnam.
 
 
 2
 The appeal is based on asserted error in the trial court's instructions to the jury. The appellants claim that: (1) The trial court erred in charging the jury on the definition of criminal intent and the meaning of "willfully," and (2) That the trial judge should have informed the jury that it had the power to acquit the defendants even if they were clearly guilty of the offenses, or at least, that the court should have permitted their counsel so to argue to the jury.
 
 
 3
 * For the appellants to be convicted of the crimes for which they were indicted, they must have acted knowingly (50 App. U.S.C. § 462(a)) or willfully (18 U.S.C. §§ 1361, 2071(a)). The trial court instructed the jury to the effect that the willful intent requisite to constitute a violation of the statutes involved is the intent on the part of the accused to commit the proscribed acts with knowledge that they were violating the statute. Defense counsel urged upon the court a more expansive interpretation of the word "willful" as used in the statutes, namely that no violation occurred unless defendants performed the admitted acts with a bad purpose or motive. Their position was and is that since they acted from good motives, i. e., to protest a war which they sincerely believed was not only illegal[2] but immoral, they could not have "willfully" violated the statutes and must be acquitted. We agree with the interpretation of the trial judge.
 
 
 4
 To read the term "willfully" to require a bad purpose would be to confuse the concept of intent with that of motive. The statutory requirement of willfulness is satisfied if the accused acted intentionally, with knowledge that he was breaching the statute. While the trial judge allowed evidence to be freely admitted concerning the defendants' motives, whatever motive may have led them to do the act is not relevant to the question of the violation of the statute, but is rather an element proper for the judge's consideration in sentencing.
 
 
 5
 The cases appellants cite to support their argument with respect to "willfulness" are not controlling in the present situation. In Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, the defendant removed a number of spent bomb casings from an Air Force bombing range under the mistaken belief that the casings had been abandoned. The Supreme Court reversed his conviction, holding that his mistaken belief negated the requisite mens rea. He was acting in good faith since he believed that the casings had been abandoned. However, this is not to say that Morissette would have been entitled to acquittal if he had taken the bomb casings with the knowledge that they were not abandoned, but did so for the purpose of protesting the use of bombs as weapons of destruction. Similarly, the appellants in the instant case could not destroy Government property with knowledge that the destruction was illegal and claim that, due to their motivation, the action lacked the requisite willful intent.
 
 
 6
 Other cases[3] cited by appellants likewise stand for the incontestable proposition that a mistaken belief as to a material fact may negate the requisite mens rea. Here the appellants, by their own admissions accompanying the acts, knowingly and purposely committed the offense denounced by the statute. They do not challenge the validity of the laws under which they were prosecuted. Furthermore, the language of cases cited by appellants supports the interpretation the district court and we place on "willfulness."[4]
 
 II
 
 7
 Appellants' second contention is that the trial judge should have informed the jury, as requested, that it had the power to acquit even if appellants were clearly guilty of the charged offenses. They maintain that the judge should have told the jury this or permitted their counsel to argue it to the jury in the face of the judge's instruction on the law. Appellants reason that since the jury has "the power to bring in a verdict in the teeth of both law and facts,"[5] then the jury should be told that it has this power. Furthermore, the argument runs, the jury's power to acquit where the law may dictate otherwise is a fundamental necessity of a democratic system. Only in this way, it is said, can a man's actions be judged fairly by society speaking through the jury, or a law which is considered too harsh be mitigated.
 
 
 8
 Historically, a fierce controversy has raged over the question of whether the trial judge was under a duty to instruct the jury that it may disregard the law as he has explained it.[6] The earliest reported case adhering to the distinction between law and fact in regard to the respective roles of judge and jury in criminal cases seems to be Plowden's report of Townsend's case where the reporter comments, "For the office of 12 men is no other than to inquire of Matters of Fact and not to adjudge what the Law is, for that is the office of the Court and not of the Jury * * *."[7] While Littleton had earlier recognized the power of the jury to "determine the crime or issue by their verdict"[8] upon the basis of both law and fact, it is Lord Coke's famous pronouncement which firmly established the law/fact dichotomy in English Jurisprudence:
 
 
 9
 The most usual triall of matters of fact is by 12 such men; for ad quaestionem facti non respondent judices; and matters in law the judges ought to decide and discuss; for ad quaestionem juris non respondent juratores.[9]
 
 
 10
 In the early history of the American Colonies and for a time after the Revolution juries were nearly always recognized as having the power to judge both law and fact.[10] This is exemplified in the early Supreme Court case of Georgia v. Brailsford, 3 Dall. 1, 4, 1 L.Ed. 483, in which Chief Justice Jay declared:
 
 
 11
 * * * for as, on the one hand, it is presumed that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still, both objects are lawfully within your power of decision.
 
 
 12
 In criminal cases juries remained the judges of both law and fact for approximately fifty years after the Revolution. However, the judges in America, just as in England after the Revolution of 1688, gradually asserted themselves increasingly through their instructions on the law.
 
 
 13
 We recognize, as appellants urge, the undisputed power of the jury to acquit, even if its verdict is contrary to the law as given by the judge and contrary to the evidence. This is a power that must exist as long as we adhere to the general verdict in criminal cases, for the courts cannot search the minds of the jurors to find the basis upon which they judge. If the jury feels that the law under which the defendant is accused is unjust, or that exigent circumstances justified the actions of the accused, or for any reason which appeals to their logic or passion, the jury has the power to acquit, and the courts must abide by that decision.
 
 
 14
 Concededly, this power of the jury is not always contrary to the interests of justice. For example, freedom of the press was immeasurably strengthened by the jury's acquittal of John Peter Zenger of seditious libel, a violation of which, under the law as it then existed and the facts, he was clearly guilty. In that case Andrew Hamilton was allowed to urge the jury, in the face of the judge's charge, "to see with their own eyes, to hear with their own ears, and to make use of their consciences and understanding in judging of the lives, liberties, or estates of their fellow subjects."[11]
 
 
 15
 No less an authority than Dean Pound has expressed the opinion that "Jury lawlessness is the great corrective of law in its actual administration."[12] However, this is not to say that the jury should be encouraged in their "lawlessness," and by clearly stating to the jury that they may disregard the law, telling them that they may decide according to their prejudices or consciences (for there is no check to insure that the judgment is based upon conscience rather than prejudice), we would indeed be negating the rule of law in favor of the rule of lawlessness. This should not be allowed.
 
 
 16
 The Supreme Court, in the landmark case of Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), affirmed the right and duty of the judge to instruct on the law, and since that case the issue has been settled for three-quarters of a century. Justice Harlan's scholarly opinion traced the history of the rights of juries in criminal cases. He distinguished Brailsford as a civil case and therefore not controlling in criminal trials. Justice Harlan further deprecated that decision, going to the extreme of questioning whether it was in fact reported properly, since he doubted that Chief Justice Jay could ever have held such an opinion even in a civil case. The Justice concluded finally that
 
 
 17
 Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves. Under such a system, the principal function of the judge would be to preside and keep order while jurymen, untrained in the law, would determine questions affecting life, liberty, or property according to such legal principles as, in their judgment, were applicable to the particular case being tried. * * *
 
 
 18
 But upon principle, where the matter is not controlled by express constitutional or statutory provisions, it cannot be regarded as the right of counsel to dispute before the jury the law as declared by the court. * * * We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence.[13]
 
 
 19
 There was a powerful dissent by Justice Grey joined by Justice Shiras. As in the majority decision, Justice Grey historically traced the authorities and the classic arguments to support his conclusion that the jury should decide both the law and the facts.[14]
 
 
 20
 The Harlan majority opinion, however, has carried the day. Since the Sparf case, the lower federal courts — even in the occasional cases in which they may have ventured to question its wisdom[15] — have adhered to the doctrine it affirmed.[16] Furthermore, among the states, only two still allow the jury to be told that they can disregard the law as given them by the court.[17]
 
 
 21
 The recent case of United States v. Spock et al., 416 F.2d 165 (1st Cir. 1969), heavily stressed by the appellants in their supplemental memorandum, does not reach a different conclusion. That case was concerned with the question arising from submission of special interrogatories to the jury. The First Circuit, speaking through Chief Judge Aldrich, concluded that
 
 
 22
 By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.[18]
 
 
 23
 Nowhere does the court intimate that the judge should not instruct the jury on the law, and nowhere does it hold, as appellants here contend, that the jury should be instructed that it may disregard the law as declared by the judge.
 
 III
 
 24
 As an undercurrent throughout the trial and interwoven with appellants' assertions of error is an appeal to morality as justification for their conduct. The argument consists of two closely related strands. They argue that the motivation for their action was moral in the sense that they intended to protest a war which is outrageous to their individual standards of humanity. Therefore, their actions are said to be not punishable regardless of the literal violation of a statute. Moreover, appellants argue that apart from their motivation, which is subjective, the war in Vietnam is in fact illegal and immoral and hence their acts in protest of this war were themselves moral acts for which they must be similarly immunized from punishment.[19] In effect, the appellants focus upon the means by which an organized society treats those citizens who choose to commit an act of civil disobedience in the name of justice.
 
 
 25
 From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed.[20] Faced with the stark reality of injustice, men of sensitive conscience and great intellect have sometimes found only one morally justified path, and that path led them inevitably into conflict with established authority and its laws. Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.[21]
 
 
 26
 The defendants' motivation in the instant case — the fact that they engaged in a protest in the sincere belief that they were breaking the law in a good cause — cannot be acceptable legal defense or justification. Their sincerity is beyond question. It implies no disparagement of their idealism to say that society will not tolerate the means they chose to register their opposition to the war. If these defendants were to be absolved from guilt because of their moral certainty that the war in Vietnam is wrong, would not others who might commit breaches of the law to demonstrate their sincere belief that the country is not prosecuting the war vigorously enough be entitled to acquittal? Both must answer for their acts.
 
 
 27
 We are not called upon in this case to establish guidelines for determining in what extreme circumstances, if any, governmental acts may be resisted. We confine ourselves to this case and hold only that the law does not allow the seizure of public records and their mutilation or destruction, even when this is done as an act of conscience to dramatize the protest of a presumed evil. The acts of these appellants are not as extreme as some committed by other dissenters. Nevertheless, this publicly exploited action cannot be dismissed as de minimis. To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic.
 
 The judgment below is
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Title 18 U.S.C. § 1361 provides in pertinent part:
 Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, shall be punished as follows:
 * * *.
 Title 18 U.S.C. § 2071(a) provides:
 Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined not more than $2,000 or imprisoned not more than three years, or both.
 Title 50 App.U.S.C. § 462(a) provides in pertinent part:
 * * * or any person or persons who shall knowingly hinder or interfere or attempt to do so in any way, by force of violence or otherwise, with the administration of this title (said sections) or the rules or regulations made pursuant thereto, or who conspires to commit any one or more of such offenses, shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, * * *.
 
 
 [2]
 Defendants have repeatedly linked a characterization of the war as illegal with their assertions that it is immoral. Since despite this assertion of illegality they have not briefed or argued the question — nor has the Government done so — we will not pass on the issueSee, Holmes v. United States, 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968).
 
 
 [3]
 Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945); United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933); Okamoto v. United States, 152 F.2d 905 (10th Cir. 1945)
 
 
 [4]
 Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 ("an evil motive to accomplishthat which the statute condemns is a constituent element of the crime.") (Emphasis added.) United States v. Rabb, 3 Cir., 394 F.2d 230, 232 ("The word `willfully' as used in the crime charged means the act (or omission) was committed (or omitted) by the defendant voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident or in good faith.")
 
 
 [5]
 Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920)
 
 
 [6]
 The classic debate is found in the several opinions of the Justices in Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895)See also, e. g., Skidmore v. Baltimore & Ohio RR Co., 167 F.2d 54 (2d Cir. 1948); Morris v. United States, 156 F.2d 525 (9th Cir. 1946); Farley, Instructions to Juries — Their Role in the Judicial Process, 42 Yale L.J. 194 (1932); Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939); Thayer, The Jury and Its Development, 5 Harv.L. Rev. 249 (1892).
 
 
 [7]
 1 Plowden 110a, 114a (K.B. 1554) cited in Farley,supra n. 6 at 198. Also see, e. g., Hobard 53 (K.B. 1615); Dyer 362a 15 (K.B. 1557); Hard. 16 (Ex. 1655); 2 Bulst. 314 (K.B. 1614). For cases cited to support juries as the judge of both law and fact see, e. g., Rex v. Dean of St. Asaph's, Conscience and Anarchy: The Prosecution of War Resistors, The Yale Rev., Vol. LVII (1968) at 484.
 
 
 [8]
 Littleton, Co. Litt. 368
 
 
 [9]
 1 Coke on Littleton (1st Am fr. 19th London ed. 1853) 155b cited in Sunderland, Verdicts, General and Special, 29 Yale L.J. 253 (1920)
 
 
 [10]
 Appendix II of Quincy Reports (Mass. 1761) 559
 
 
 [11]
 Alexander, James, A Brief Narrative of the Case and Trial of John Peter Zenger (Harv.U.Press 1963) ed. by Stanley Nider Katz at 93
 
 
 [12]
 Pound, Law in Books and Law in Action, 44 Am.L.Rev. 12, 18 (1910)Also see, e. g., Sparf and Hansen v. United States, supra 156 U.S. n. 6 at 110, 15 S.Ct. 273 (Gray and Shiras, JJ., dissenting); United States v. Sisson, infra n. 15; Howe, supra n. 6.
 
 
 [13]
 Sparf and Hansen v. United States,supra n. 6 at 101-102, 15 S.Ct. at 293.
 
 
 [14]
 Id. at 110, 15 S.Ct. 273
 
 
 [15]
 United States ex rel. McCann v. Adams, 126 F.2d 774, 775-776 (2nd Cir. 1942); United States v. Sisson, 294 F.Supp. 520, 524-525 (D.Mass.1968)
 
 
 [16]
 See, e. g., Berra v. United States, 351 U.S. 131, 134, 76 S.Ct. 685, 100 L.Ed. 1013 (1956); Horning v. District of Columbia, supra n. 5, 254 U.S. at 138, 41 S.Ct. 53; Hepner v. United States, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909); Capital Traction Co. v. Hof, 174 U.S. 1, 13-14, 19 S.Ct. 580, 43 L.Ed. 873 (1898); Driscoll v. United States, 356 F.2d 324 (1st Cir. 1966); Skidmore v. Baltimore & O. R. Co., supra n. 6; Morris v. United States, supra n. 6, 156 F.2d at 525; Ex parte United States, 101 F.2d 870, 131 A.L.R. 176 (7th Cir. 1939).
 
 
 [17]
 Maryland and IndianaSee, e. g., Wyley v. Warden, Maryland Penitentiary, 372 F.2d 742 (4th Cir. 1967), where it was stated that "Indiana has substantially attenuated its provision by judicial modification, holding as early as 1889 that a trial court in a criminal case `is not required to neutralize the effect of its instructions by telling the jury that they are at liberty to disregard them, and to decide the law themselves.'" citing from Bridgewater v. State, 153 Ind. 560, 566, 55 N.E. 737, 739 (1889).
 
 
 [18]
 United States v. Spock et al., 416 F.2d 165, at 182 (July 11, 1969)
 
 
 [19]
 The motivation prompting the defendants' acts was eloquently expressed by defendant James Darst:
 "The basic human duty is to cry out in the face of a crime, in the face of suffering that can be prevented, perhaps, by a cry * * * [and] doing a very tiny bit to stop the machine of death that I saw moving and killing * * * to hinder this effort in a literal way, an actual, physical, literal way, by preventing these people, these young men, from being taken by the war effort and then put to killing people unnecessarily."
 Trial testimony of James Darst, 401-402.
 
 
 [20]
 Among the more recent discussions of the dilemma that civil disobedience presents in our societysee, e. g., Allen, Civil Disobedience and the Legal Order, 36 U.Cin.L.Rev. 1, 175 (1967); Black, The Problem of the Compatibility of Civil Disobedience with American Institutions of Government, 43 Texas L.Rev. 492 (1965); Cohen, Freeman & Van den Haag, Symposium — Civil Disobedience and the Law, 21 Rutgers L.Rev. 1 (1966); Griswold, Dissent — 1968, 42 Tulane L.Rev. 726 (1968); Keeton, The Morality of Civil Disobedience, 43 Texas L.Rev. 507 (1965); Rosen, Civil Disobedience and Other Such Techniques: Law Making Through Law Breaking, 37 Geo.Wash.L.Rev. 435 (1969); Smith, Legitimacy of Civil Disobedience as a Legal Concept, 36 Fordham L.Rev. 707 (1968). See also, Fortas, Concerning Dissent and Civil Disobedience (1968); King, Why We Can't Wait (1964); Whittaker and Coffin, Law, Order and Civil Disobedience (1967).
 
 
 [21]
 Adherents and practitioners of civil disobedience who have reached this conclusion are too many to list. One need only allude to Socrates, Sir Thomas More, Henry David Thoreau, Gandhi, and Martin Luther King, Jr. whose actions supported this proposition. The Lutheran and Episcopal Churches in America have endorsed civil disobedience, but only if action is non-violent and the actor is willing to accept the consequences of his actionSee, Lutheran Church in America, Statement on Race Relations, July 9, 1964 (adopted by the 1964 convention of the church in Pittsburgh, Penna.); Episcopal Church, Report No. 5 on Christian Social Relations (adopted by the 1964 General Convention of the Church in St. Louis, Missouri).