UNITED STATES of America

v.

Lin M. ROMANO, Appellant.

No. 87–1727.

United States Court of Appeals,
Third Circuit.

Argued May 3, 1988.
Decided June 16, 1988.

Peter Goldberger (argued), Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Michael R. Lazerwitz (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, and MANSMANN and COWEN, Circuit Judges.

OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises from a judgment of conviction entered by the district court against appellant Lin M. Romano. Along with a codefendant, Romano was found guilty of damaging government property in excess of $100.00 in violation of 18 U.S.C. §§ 1361 and 1362, conspiring to damage government property in violation of 18 U.S.C. § 371, and entering a military installation for an unlawful purpose in violation of 18 U.S.C. § 1382. Because we determine that the district court violated Ms. Romano's sixth amendment right to counsel when it revoked her right to proceed pro se and thereafter denied her the opportunity to retain at her own expense competent counsel of her choice, we will reverse the judgment of conviction.

I.

The facts involved are not in dispute. During the early morning hours of the Christian feast of the Epiphany, January 6, 1987, Romano and three others, Gregory I. Boertje, Father Dexter Lanctot and Father

Thomas A. McGann, calling themselves the Epiphany Plowshares, broke into the Willow Grove Naval Air Station and inflicted over $160,000.00 worth of damage to military aircraft. The four used various implements to, among other things, break instrument panels and equipment controls, cut hydraulic lines and smash windows. In addition, they poured blood in the cockpits and on the aircraft. They also left tools inscribed with various epitaphs,[1] pamphlets, and baby bottles filled with blood in some of the aircraft. Romano and Lanctot were discovered by military security at approximately 5:15 a.m. and were taken into custody. Later, at approximately 6:30 a.m., Boertje and McGann were detected in another area of the base and were also arrested.

On February 3, 1987, a federal grand jury returned indictments against the four, charging each with three counts: conspiring to damage government property in violation of 18 U.S.C. § 371 (Count 1); damaging government property in excess of $100.00 in violation of 18 U.S.C. §§ 1361 and 1362 (Count 2); and entering a military installation for an unlawful purpose (damaging property) in violation of 18 U.S.C. § 1382 (Count 3).

Romano proposed to represent herself at trial. Accordingly, on March 16, the trial court held a pre-trial hearing concerning Romano's desire to waive the assistance of counsel. The court accepted Romano's waiver of the right to counsel and allowed her to continue pro se, with the assistance of William Durland, an attorney.

On March 31, 1987, the four defendants proceeded to trial, which ended in a mistrial on April 7 after the jury could not come to an unanimous verdict. A new trial was set for May 11. However, this trial also resulted in a deadlocked jury and a mistrial

was declared on May 18. A third trial was scheduled for July 13.

In the interim between the second and third trials, Fathers Lanctot and McGann pled guilty to Count Three and each received a sentence of 100 days imprisonment and a $500.00 fine. The government agreed to drop Counts One and Two of the indictment against them.

The third trial began on July 13, 1987. Mid-way through that trial, on July 15, the trial court, on the government's motion, again declared a mistrial, this time determining that the actions of defendants Romano and Boertje as well as comments of certain disruptive observers in the courtroom so prejudiced the jury that a new trial was necessary. A fourth trial was scheduled for September 21, 1987.

Due to Romano's conduct at the third trial, the district court held a hearing on August 10 to consider whether she would be permitted to continue to represent herself at the fourth trial. Although the court continued to allow Romano to proceed pro se, over her objection the court also appointed John G. McDougall as stand-by counsel. It was the position of the district court that stand-by counsel was to assume Romano's representation should she do or say something during the fourth trial which would cause the court to revoke her pro se status. Romano requested that Durland, the attorney who had been advising her in the previous three trials, be appointed stand-by counsel. However, the court refused, instead making the appointment from the CJA list. The court indicated that it would not allow Romano to select an attorney of choice once the trial started, should she lose her right to proceed pro se.

In addition, prior to the start of the fourth trial, the court re-entered an in limine order,[2] which prohibited both Romano

---

1. Some of the inscriptions read: "Blessed are the peacemakers", "Jesus Christ", "Shalom", "Non-violence = disarmament", "War no more", "Choose life", "For the children", " 'Swords into plowshares' Is. 2:4", "Peace", "Civil intervention", "Love", "Love your enemy", "contra aid is criminal", "Freedom", " 'All who take the sword will die by the sword' Mt. 26:52", " 'Be at peace with all' He 12:14", " 'We must love one another'

Jn 3:11", and " 'Dedicated to the Lord' Zec. 14:20".

2. This in limine order had been requested by the government prior to the second trial, and was entered by the court after it had presented the parties with an opportunity to be heard. The court had re-entered the order at the start of the third trial as well.

and the government from arguing, discussing or offering proof in the presence of the jury of the defendants' motives, any crimes committed by the United States Government or its officials, United States foreign or domestic policy, the use of the aircraft damaged by defendants, or international or divine law without prior bench approval that such evidence was relevant to the crimes charged in the indictment.[3]

The fourth trial commenced on September 22. In her opening statement to the jury, Romano touched on subjects which the court later (at a contempt hearing) determined were prohibited by the in limine order.[4] By reason of her conduct, the court at that point found Romano in contempt, revoked her right to continue to represent herself, and directed McDougall to assume her defense. The trial continued, this time the jury returning with a verdict of guilty on all three counts of the indictment. On November 16, the district court denied Romano's motion for a new trial based on the issues of the appointment and the conduct of stand-by counsel during the trial. The next day, the trial court sentenced Romano to two years imprisonment on Count Two, 100 days imprisonment on Count Three to run consecutively with the sentence imposed on Count Two, and five years probation on Count One to run consecutively with the sentences imposed on Counts Two and Three. Romano now appeals to this Court.

## II.

On appeal, Romano challenges the district court's entry of an in limine order, arguing that it was unnecessarily restrictive and had the effect of limiting the presentation of her defense. The district court's entry of the order itself is subject to an abuse of discretion standard of review. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 260 (3d Cir., 1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, with regard to the propriety of any rulings made pursuant to the order, the "[s]cope of review ... depends in each instance on the nature of the ruling." *Id.* at 257. If the ruling is factual, our review is limited to the clearly erroneous standard. If the ruling is based on a legal standard, our review is plenary. *Id.*

Romano also challenges the court's decision denying her an opportunity to retain counsel of choice upon her forfeiture of pro se status. Usually, a court's decision to appoint counsel over the objection of a defendant would be a matter subject to an abuse of discretion standard of review. *See United States v. Laura,* 607 F.2d 52, 57 (3d Cir.1979). However, as the district

---

**3.** The order stated, in relevant part:

1. No defendant ... nor the government shall in the presence of the jury mention, discuss, or present any testimony or other evidence regarding the motives of the defendants or the justification defenses of crime prevention or necessity, including but not limited to, such crimes as:

(1) alleged crimes which were or are being committed by the United States military and/or other federal officials at Willow Grove or elsewhere;

(2) the use or deployment of the helicopters and/or aircraft alleged to have been damaged;

(3) the policy of the United States, either foreign or domestic, concerning defense, arms or spending;

(4) international law; and

(5) divine law or other religious teachings, unless and until an offer of proof has been made at side bar or otherwise outside the presence of the jury and the Court has ruled on its admissibility as being relevant to an essential element of the crimes charged in the indictment or a defense to the crimes charged in the indictment; it being understood that the defendants shall not be limited in any way in cross-examining government witnesses or presenting evidence concerning their intent or mental state with regard to the crimes charged in the indictment....

App. at 32–33.

**4.** Romano stated, inter alia: "You will hear testimony about the blood, which was spilled on the aircraft, representative of the millions who will die needlessly, in illegal, immoral atomic war. Of the thousands that were slaughtered now in the war that we perpetrate in other lands ... We intend to put forth in testimony that we also made banners to take with us to proclaim the basis for our action to witness to the truth, the rightness and the legality of our action; releasing captive Jews from Nazi death camps or dismantling those gas chambers ... What this case is really about is the slaughter of innocent people." App. at 132, 137.

court's decision in this instance was based on its interpretation and application of a legal precept, our review is plenary. *United States v. Adams*, 759 F.2d 1099, 1106 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985).

## III.

### A.

■ Romano's first allegation of error is that the district court improperly prevented her from pursuing her defense through an in limine order. Romano asserts that the scope of the order effectively precluded her from testifying or otherwise presenting a defense to the charges in the indictment and that the order was an abuse of discretion. We find Romano's arguments on this point to be without merit.

The district court is given wide latitude in deciding what should be allowed into evidence. *Complaint of Bankers Trust Co.*, 752 F.2d 874, 889–90 (3d Cir.1984). Clearly, a court need not allow a defendant to present evidence on, or to discuss, anything she wishes the jury to hear. Indeed, a court would be remiss if it failed to screen what the jury is exposed to because of the potential for jury confusion or prejudice. A trial judge has a duty to limit the jury's exposure to only that which is probative and relevant and must attempt to screen from the jury any proffer that it deems irrelevant. Fed.R.Evid. 103(c). In order to fulfill this duty, the court may utilize a number of vehicles, including the use of an in limine order. *See Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984) ("Although the Federal Rules of Evidence

do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."); 21 C. Wright and K. Graham, *Federal Practice and Procedure* § 5042, at 232–35 (1977); Federal Judicial Center, *Manual for Complex Litigation, Second* § 32.23, at 271–72 (1985). We see nothing, either in the order itself or in its scope, which would give us reason to question the discretion exercised by the district court in entering the order. Because we find that the district court utilized an appropriate method of shielding the jury from arguments and evidence it deemed irrelevant, Romano's suggestion that the use of an in limine order was error must be rejected.

We also reject Romano's assertion that the effect of the order prevented her from going forward with her defense. Romano refused to testify, apparently taking the position that she could not have done so within the confines of the court's order and would have been held in contempt had she testified.[5] Romano claims that the court's rulings under the order made it clear to her that she would not be allowed to relate her intent in participating in the actions underlying the charges in the indictment.[6] The court's predisposition to preclude Romano from telling her side of the story is not so clear to us. What is clear is that the court was going to limit Romano's defenses and testimony to only that which it deemed legally relevant (which the court has the discretion and the obligation to do).

A more fundamental problem, in our view, is Romano's failure to testify, which makes it impossible for us to assess whether Romano would have proffered testimony

---

**5.** Romano stated: "I would like to [testify and present witnesses on my behalf], except that because of [the court's] Order, I'm not being allowed to speak the truth, and therefore, I'm not going to perpetrate the—." Supp.App., at 382.

**6.** Romano argues that there is a "national judicial consensus" which supports allowing defendants "to testify freely in their own terms" in protest cases, and that a jury can "be instructed that the testimony has but limited probative value and narrow materiality." Appellant's Brief, at 21. As set forth in section III.A. above,

the trial court should control the jury's exposure to irrelevant or extraneous proffers and arguments. Certainly, though, the court may choose to give a defendant leeway in presenting arguments and testimony, and then give a limiting instruction to the jury in the event such is necessary. This would preclude a defendant from arguing, as here, that she was denied the opportunity to present her side of the story. However, the decision to proceed in this manner is vested in the discretion of the district court; by no means is the court obligated to proceed in the manner suggested by Romano.

relevant to a legally cognizable defense, and whether the court would have excluded that testimony. Romano apparently believed that the court would have prevented the jury from considering her arguments and proffers of evidence as it did in the second and third trials. However, we view this belief as speculative, given that Romano did not fully give the district court a chance to consider her proffers and state for the record its reasons for precluding their presentation to the jury. Indeed, as Romano herself recognized, "the lower court or this Court [could not] assume that [her] testimony would have been exactly the same as at the first or second trial[s]." Appellant's Brief, at 26. We decline to reverse based on mere speculation as to what the district court would have done.[7]

**B.**

◼ Romano also challenges the district court's denial of her attempt to secure counsel of choice after the court had revoked her right to appear pro se. The government misunderstands and mischaracterizes Romano's argument in suggesting that Romano has asserted a right to select stand-by counsel of choice, or to proceed pro se and also retain counsel. Romano argues neither, clearly recognizing that she has no such rights. *See Siers v. Ryan,*

773 F.2d 37, 44 (3d Cir.1985) ("[T]here [is no] absolute right to counsel of one's choice."); *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984) ("*Faretta* does not require a trial judge to permit "hybrid" [i.e., both pro se and stand-by] representation...."). Rather, Romano avers that once her right to appear pro se was lost, she should have at that point been granted the opportunity to secure counsel of her choosing, instead of having stand-by counsel being forced upon her. We find Romano's argument in this respect to be persuasive. Here, the court appointed stand-by counsel prior to the fourth trial, and at that time presented Romano with the choice of proceeding pro se or retaining counsel of choice. The court made it clear that Romano would have to retain counsel prior to the start of trial, but that if she chose to proceed on her own and should she lose her pro se status, she would then have waived the right to retain counsel of her choice:

"MS. ROMANO: I again don't believe that you should appoint counsel for me. Furthermore, I would not be able to meet with such counsel, I would not be able to speak with him, I would not ask him to ever render assistance to me during the trial. In effect, you would be placing someone as a barrier to my defense and

---

**7.** Even if we were to accept Romano's characterization of what she would have testified to and assuming that the court would have excluded this testimony, that testimony would be irrelevant. Specifically, Romano asserts that she would have testified that she harbored a "serious and compassionate world view that is highly respectful of law and individual rights." Appellant's Brief, at 22. We fail to see how this explanation was legally relevant to a substantive defense she might have maintained with respect to the crimes charged in the indictment.

The testimony Romano asserts she would have given obviously would not serve to deny her participation in the alleged unlawful actions (in fact Romano admits her participation), it would not form the basis for the justification defenses of necessity, *see e.g., United States v. Dorrell,* 758 F.2d 427 (9th Cir.1985); *United States v. Kabat,* 797 F.2d 580, 590–92 (8th Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987), or crime prevention, *see e.g., United States v. Berrigan,* 283 F.Supp. 336 (D.Md.1968), *aff'd sub nom. United States v. Eberhardt,* 417 F.2d 1009, 1012 (4th Cir.1969),

*cert. denied,* 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed. 2d 90 (1970), (Romano does not contest the district court's ruling striking these defenses on appeal), nor would it serve to create any other defense we are aware of to the charges she faced.

Likewise, Romano's end motive of protecting innocent lives could not adequately negate or explain her specific intent to achieve this end through breaking into a military installation and disabling military aircraft. *Kabat,* 797 F.2d at 587–88; *United States v. Moylan,* 417 F.2d 1002, 1004–05 (4th Cir.1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). In other words, it would only be Romano's intent in entering government land and damaging government property, rather than her intent to save lives, which would be relevant. Since Romano's position speaks only to the latter it is irrelevant. Thus, while Romano's beliefs might be properly considered as mitigation at sentencing, they were not relevant for purposes of defending the substantive charges, and would have been properly excluded had they been presented.

depriving me of my constitutional right to defend myself, without any barriers and obstructions.

"THE COURT: Well, I'm not ordering you to confer with him. I'm ordering the counsel to attempt to confer with you, and if you wish to, that's your determination, that you don't wish to talk to them, but they're going to be here.... And they'll be here in this courtroom. They'll be available to you. And I want you to know that in the event that any time the Court finds it necessary, and I've already explained that to you, the standby counsel will take over.

"MS. ROMANO: Additionally, I intend to have an attorney advisor of my own choosing with me during the course of the trial.

"THE COURT: The Court will not, just as long as you understand that the good Brother is sitting down there, he's one of the attorney advisors to one of you, I know, and I'm not sure, I think at the last trial he advised both of you and he's welcome. But the unfortunate part about an attorney advisor, he cannot proceed unless you select him as your counsel.

"MS. ROMANO: I understand that. In the event that you attempted to appoint standby counsel, I would reserve the right to have my own counsel take over at that point.

"THE COURT: At that point, I'm appointing standby counsel now, today. So, there's no misunderstanding, I told you that, I'm going to do it. You have an exception. And I'm going to tell you that I'm ordering standby counsel to attempt to confer with you ... and to be available to answer your questions and to help you in any way and to be in this courtroom, and to be prepared in the event of the matters such that if it become[s] necessary, and I'm not going to go through all of the things that might happen, the standby counsel will be ordered to take over. So, that's in your hands.

"MS. ROMANO: The question, I suppose that's being posed to you is in the event that that situation arises where you feel for whatever reason you need to appoint standby counsel to take over, I would like to have the right to have my own attorney advisor play that role, rather than someone with whom I've never conferred.

"THE COURT: I think I can tell you right now you have the right to have counsel and to have counsel appointed. The Court is going to appoint standby counsel, ... And standby counsel will be appointed under the Criminal Justice Act. Standby counsel will be paid by the, in effect, by the taxpayers, and he's going to be in this courtroom and to take over.

"You have the absolute right, right now if you, and incidentally, I will give you that right anytime before we go to trial to select counsel and have someone else, if that's the counsel of your selection, be it not appointed but be retained by you, and provided, of course, that he is eligible under the rules to act as counsel.

"MS. ROMANO: Then I would ask that as standby counsel, my attorney advisor for the first three trials, William Durland be allowed to fulfill that role, not appointed under CJA, but retained.

"THE COURT: Well, I'll tell you right now that you can have anybody you want as your attorney advisor, but I'm appointing counsel, and they're going to be appointed today and you know what they're going to do.

.    .    .    .    .

(Discussion off the record)

"MS. ROMANO: I do have a question.

"THE COURT: What's that?

"MS. ROMANO: Two questions, actually. In light of the fact that I would have my own counsel for which the taxpayers would not be responsible for paying, I don't understand why you would not allow my own counsel to be standby counsel, a counsel of my own choosing. I would like you to explain that to me.

"THE COURT: Because I have just determined as a result of this hearing that I'm appointing standby counsel. And if you desire to have counsel in these proceedings, you may retain a counsel and advise

the Court. And I will tell the standby counsel that they're no longer necessary—

.    .    .    .    .

"But I'm not going to proceed in any different way than I have just told you.

"MS. ROMANO: I have retained standby counsel, and that person is William Durland.

"THE COURT: There's no such thing as retained standby counsel. I'm appointing standby counsel, and if you retain counsel, you may do so prior to the commencement of this trial, and just advise the Court and that's it.

.    .    .    .    .

"MS. ROMANO: I am advising you that I do have an attorney of my own choosing who I will have in the courtroom, who will be prepared to carry on with the case in the event that you decide that you no longer wish to have me represent myself. And I cannot understand why you would then force upon me an attorney with whom I will have no relationship and who obviously will not have a clear understanding of the case as Mr. Durland does.

"THE COURT: I want to tell you that nobody is forcing anything upon you. If you want that attorney to represent you, you have a right if he's a member of this bar to retain him....

"MS. ROMANO: And I have done that.

"THE COURT: But this Court also has the right and the duty after exhibiting the conduct that has been, I'll say observed by this Judge in the last trial, this Court is appointing standby counsel, and you know what the standby counsel is going to be instructed to do.

"Now you can retain counsel, each of you. And frankly, I hope you do because I think it's to your advantage to have counsel, but that's all we're going to hear this morning. You have an exception, I understand.

"MS. ROMANO: I would like more than an exception. I would like you to understand what I'm saying to give me—

"THE COURT: Oh, I understand what you are saying, but I just want you to know that there's no such thing in the good book, and by the good book, I mean in the law, somebody saying, I'm going to have standby counsel sitting there, and in case I do something that you don't like, why I'm just going to have somebody else, and that's not the way this Court is going to operate. You have an exception."
App. at 79–84.

"MS. ROMANO: Then please explain to me your objection to having him be the standby counsel.

"THE COURT: Because I just made a ruling that I'm appointing standby counsel for you, and that is a recognized procedure under the law. And I'm telling you that you have an absolute right to a counsel of your own choosing, but you're going to have to choose him now, between now and the time the trial starts or considerably before the trial starts so he'll be well prepared to represent you well."
App. at 85. Later, upon the revocation of her pro se status, the district court reaffirmed its position to deny Romano her choice of counsel:

"MS. ROMANO: Again I would request counsel of my choice.

"THE COURT: I want you to know that at this time, I had appointed—not at this time, it was sometime ago, the date by the way, we had a hearing, I believe it was the tenth of August.

"MS. ROMANO: At that time, I requested counsel of my choice.

"THE COURT: At that time, I appointed standby counsel and this is the procedure that is going to be employed by the Court."
App. at 148–49.

We find no legal support for the district court's decision to deny Romano the right to retain counsel once she lost her pro se status. To the contrary, we find that the denial of the opportunity to select counsel of choice violated Romano's rights under the sixth amendment. Although the Supreme Court suggested the procedure employed by the district court here, namely, the appointment of stand-by counsel who may take over the representation of a criminal defendant should that defendant lose

his pro se status, *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975), the Court has never indicated that a criminal defendant will irrevocably waive all right to select counsel of choice once he or she has decided to proceed pro se.

We have recognized that "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Laura,* 607 F.2d 52, 56 (3d Cir.1979). This is so because the defendant relies on the attorney for many things, including information upon which to make an informed choice on the appropriate defense(s) to the charge(s), and also because the defendant gives to the attorney the authority to make binding decisions as to objections and trial strategy for him. *Id.* at 56–57. We have also noted that

> [a]ttorneys are not fungible ... [and] may differ as to their trial strategy, their oratory style, or the importance they give to particular legal issues. These differences, all within the range of effective and competent advocacy, may be important in the development of a defense.... Given this reality, a defendant's decision to select a particular attorney becomes critical to the type of defense he will make and thus falls within the ambit of the sixth amendment.

*Id.* at 56 (citations omitted).

The right to choose counsel is not unqualified, however, "and must be balanced against the requirements of the fair and proper administration of justice." *United States v. Rankin,* 779 F.2d 956, 958 (3d Cir.1986). For example, "[a] defendant will not be permitted to subvert judicial proceedings or cause undue delay by designating a certain lawyer.... Nor must a court honor a belated request made not in good faith but as a transparent ploy for delay." *Id.* Here, though, there was no evidence that Romano harbored improper motives in seeking to have Durland represent her. To the contrary, the record reflects that Romano clearly (and justifiably) sought to enforce what she believed to be her constitu-

tional right to select the attorney who would best represent her interests.

The government argues that the district court would not have agreed to appoint Durland in any event because it was concerned that he would continue to represent Romano in the same manner as she represented herself, i.e., engage in the same disruptive, contemptuous conduct. Indeed, in its opinion dated November 16, 1987 denying Romano's motion for a new trial, the trial court recognized that "[i]t was her attorney advisor who acknowledged on the record on September 23, 1987 that he had advised Ms. Romano to engage in the conduct which was in direct defiance of the Court's orders." Addendum to Appellant's Brief, at 15. However, even if we were to conclude that the trial court denied Romano's request to substitute Durland for that reason, we find no support in the record to justify such a finding. Rather, the transcript of the proceedings reveals that during the contempt proceedings against Romano, Durland merely counseled his client: "I agree with what this client has done. I have advised her in that respect and I should also be held in contempt with are [sic] [her]." App. at 167. This statement was later clarified in an exchange among the court, Durland and Romano, after stand-by counsel had been directed to undertake Romano's defense:

"MR. DURLAND: If I'm not an attorney in this case, I think it's just tomfoolery to sit there and do what I have been doing.

"I have to tell you and Ms. Romano, I consider this case to be a farce under these conditions.

"THE COURT: You have a right to leave and I certainly can't order you to remain and one of the things that disturbed me was your statement that you had advised her, in other words, I believe you said, and I don't have the notes of testimony, that you had advised her in effect to do the things that this Court considered were in contempt and I don't want to now or even later have a hearing to determine whether or not you would be in contempt.

"MS. ROMANO: He advised me to be truthful.

"THE COURT: Frankly, I want to go through with these proceedings.

"MR. DURLAND: I did not advise her specifically or technically but what she said, follow her truth and I advised her to do that."

Supp.App. at 216–17. As noted by Romano's counsel at argument, Durland's position is consistent with that which would be expected of any attorney advising a client—to be truthful. Whether he agrees with the client's position is irrelevant.

On the basis of this record, and contrary to the position maintained by the government, the district court could not have deemed Durland unsuitable to assume the representation of Romano. Such a finding could only have been made after a hearing, at which time the court could have inquired as to whether Mr. Durland would engage in conduct which was in violation of the court's order when representing Romano, and made specific findings of fact consistent with the evidence. The failure to do so is fatal to the government's argument.

As we recognized in *Rankin*, "[i]nterfering with a defendant's efforts to secure counsel and thereby forcing on him representation by an undesired court-appointed attorney may amount to denial of a constitutional right." 779 F.2d at 958. We hold that by preventing Romano from retaining counsel of choice once she lost her pro se status, the district court violated her constitutional rights. The court should have allowed Romano the opportunity to secure suitable counsel of choice once it determined that she had forfeited her right to proceed pro se, and once she expressed both the desire and the financial ability to do so.[8] Because the district court's actions in this instance improperly interfered with Romano's sixth amendment right to counsel of choice, a right so fundamental that any interference cannot be deemed harmless error, the violation in this case rises to the level of reversible error. *Laura*, 607 F.2d at 58.

IV.

While we believe that the court below did not err in implementing and enforcing the in limine order, we do find that the district court's failure to allow Romano the opportunity to retain counsel of choice once it terminated her pro se status was violative of Romano's rights under the sixth amendment. Therefore, we will reverse the conviction and remand for a new trial.

---

**8.** We would, of course, expect that in situations where a defendant engages in disruptive behavior or for some other reason forfeits her right to represent herself, and cannot otherwise afford counsel, the courts should continue to appoint stand-by counsel so that the defendant's defense can go forward without undue delay.