**James Patrick SUTHERLAND,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 96–190.**

Supreme Court of Wyoming.

Sept. 16, 1997.

Sylvia L. Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; Michael Dinnerstein, Director of the Wyoming Defender Aid Program; and Catherine Rogers and Karl Linde, Student Interns for the Wyoming Defender Aid Program, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Director of the Prosecution Assistance Program; and William C. Knott, Jr. and Julie Yates, Student Interns for the Prosecution Assistance Program, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

MACY, Justice.

Appellant James Sutherland appeals from the judgment and sentence which the trial court entered after the jury found that he was guilty of committing one count of aggravated burglary and one count of burglary. In that order, the trial court adjudicated that Sutherland was a habitual criminal.

We affirm.

## ISSUES

Sutherland requests our analysis of three issues:

I. Did the prosecution fail to prove that [Sutherland] was the person who stole property and that the person who did steal the property became armed with a deadly weapon during the burglary?

II. Did the court violate [Sutherland's] constitutional due process rights by forcing him to present a defense before the prosecution had rested?

III. Does the prosecution's repeated violation of the trial court's order in limine regarding certain suppressed testimony require reversal?

## FACTS

On October 30, 1995, an information was filed which charged Sutherland with one count of aggravated burglary and one count of burglary. The two counts stemmed from two separate incidents. In the first count, Sutherland was charged with burglarizing the home of Frank Norcross on May 23rd or 24th of 1994. This charge was aggravated because Sutherland allegedly took two guns during the burglary. In the second count, Sutherland was charged with burglarizing the California Zephyr Restaurant on June 21st or 22nd of 1994.

### A. The Norcross Burglary

In mid-May of 1994, Norcross and Terry Garrison went to a Sheridan saloon. When the saloon closed, they decided that they had consumed too much alcohol to drive safely and that they needed a ride home. Sutherland offered to drive them to Norcross's residence. Upon arriving at their destination, Norcross invited Garrison and Sutherland to come in for a beer. Sutherland told Norcross that he had a nice house and proceeded to walk around the living room, looking at Norcross's belongings. Once Sutherland had his beer, he sat down on the end of the couch. While he was sitting there, he reached over the end of the couch and pulled a tin box from underneath the couch which contained a checkbook, credit card receipts, stamps, and other papers. Sutherland opened the box and began looking through it. Norcross told him to put the box back because the contents were none of his business. Sutherland returned the box to its original position. He stayed at Norcross's house for about thirty minutes.

On May 23, 1994, Norcross, who worked for the Burlington Northern Santa Fe Railroad, went on an overnight run to Forsyth, Montana. When he returned home on May 24th, he discovered that his house had been burglarized. Among the missing belongings were a Smith and Wesson twelve gauge pump shotgun, a .380 semi-automatic pistol, a Sharp VCR, a four-inch Gerber lock-blade serrated knife, a Pentax IQ60 camera in a brown vinyl case, a ukulele, a jar filled with change, footwear, and an electric razor. The tin box was sitting open on the couch, and its contents were strewn about on the couch.

Sometime after the burglary occurred, Sutherland asked George Palmer to help him sell some items including a shotgun, a small automatic pistol, a camera, a VCR, and a knife. Palmer agreed to help. Sutherland and Palmer went to see Palmer's brother, hoping that he would be interested in purchasing some of the items. While Palmer was visiting with his brother, Sutherland asked John Shaw if he would be interested in buying a .380 pistol or a shotgun. Sutherland wanted $200 for the pistol and $250 for the shotgun, and he said that he had "to move them now." Shaw told Sutherland that he needed time to think about the proposition. Approximately four days later, Shaw learned that Norcross's house had been broken into and that guns had been taken.

Sutherland approached John Schultz in a saloon and offered to sell him a Pentax camera in a leather case, a .38 caliber pistol, and a shotgun. He told Schultz that he "would know where [the items] came from." Schultz later learned from Norcross that his residence had been burglarized. Schultz realized that Sutherland had offered to sell him basically the same property as that which had been stolen from Norcross's home.

Palmer subsequently offered to sell the shotgun and some pistols to Arlo Witcher. Witcher did not have enough money for the shotgun, so he inquired about the pistols. Palmer said that he was not sure of the price of the pistols and that he would have to check with Sutherland. Approximately a week or two later, Palmer went to Carl Norskog's house where he showed the shotgun to Norskog and his son. While he was at Norskog's place, Melody Cureton made arrangements for Witcher to buy the shotgun. Palmer went to Cureton's house and sold the shotgun to Witcher for $100 and "a blast of crank." Witcher subsequently learned that the shotgun may have been stolen from Norcross. He took the shotgun to Casper and left it with his ex-wife, who turned it over to the police department.

Before Palmer sold the shotgun to Witcher, Sutherland showed it to Ford Hagaman,

who was not interested in buying it. Hagaman saw the shotgun about a week later at the Holiday Inn in a pickup which belonged to "a guy named . . . Arlo." Sutherland gave Hagaman a Sharp VCR in exchange for some controlled substances. The VCR was later identified as being the VCR that had been taken from Norcross's home.

About a week after he sold the shotgun, Palmer learned that Norcross's residence had been burglarized. Palmer confronted Sutherland, who said that he did not realize it was Norcross's house and that he would like to try to get the items back to him. Sutherland also told Palmer that, "if it came down to it[,] . . . he'd take the heat for the whole thing." Palmer admitted, however, that he did not know whether Sutherland meant that he would take the heat for the burglary or for just the shotgun. At the trial, Palmer identified the shotgun which had been taken from Norcross's residence as being the gun which he had sold to Witcher.

## B. The Restaurant Burglary

When the owner of the California Zephyr arrived at work on the morning of June 22, 1994, he discovered that his restaurant had been burglarized. The pool table and jukebox had been damaged. Money was missing from the pool table coin box, from a cigarette machine, and from a change drawer. Money was also missing from one of the envelopes that contained the tips for the waitresses. Musical equipment, including a PVKB–300 keyboard amplifier and a Crate PA head which belonged to George Kleppinger, a one-man band that was playing at the restaurant, was also taken.

Sutherland admitted to Palmer that he had entered the restaurant. Palmer saw the items which had been taken during the burglary under a tarp in the back of the pickup which Sutherland was driving. Sutherland gave Palmer an equalizer/mixer and asked him to "stash" it. Kleppinger identified the equalizer at the trial as being the Crate PA head which had been stolen from the restaurant.

## C. Charges & Verdict

Sutherland was charged with one count of aggravated burglary and one count of burglary. The jury found that he was guilty on both counts, and Sutherland admitted to being a habitual criminal. The trial court sentenced Sutherland to serve a prison term of not less than fifteen years nor more than twenty years on the aggravated burglary conviction and a prison term of not less than six years nor more than eight years on the burglary conviction with the sentences to run consecutively to each other. Sutherland appeals to this Court.

## DISCUSSION

### A. Sufficiency of the Evidence

Sutherland asserts that the prosecution failed to prove that he was the person who stole Norcross's property or that the person who did steal the property became armed with a deadly weapon while he was committing the burglary. The State contends that the evidence was sufficient to permit the jury to find that the charged crimes had been proven beyond a reasonable doubt.

Our standard for reviewing challenges to the sufficiency of the evidence is well established.

This Court assesses whether all the evidence which was presented is adequate enough to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State. We leave out of consideration entirely the evidence presented by the unsuccessful party which conflicts with the successful party's evidence, and we afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. We have consistently held that, even though it is possible to draw other inferences from the evidence which has been presented, the jury has the responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable

and rational individuals would, or even could, have come to the same result as the jury actually did.

*Bloomquist v. State,* 914 P.2d 812, 823–24 (Wyo.1996) (citations omitted). *See also Harris v. State,* 933 P.2d 1114, 1123 (Wyo. 1997).

Under Wyoming's burglary statute, the State had to prove beyond a reasonable doubt that Sutherland entered Norcross's home without his consent with the intent to commit larceny or a felony therein. WYO. STAT. § 6–3–301(a) (1997).[1] The crime would become aggravated if the State could prove beyond a reasonable doubt that, while Sutherland was committing the burglary, he was or became armed with or used a deadly weapon. WYO. STAT. § 6–3–301(c)(i) (1997).[2]

■ With regard to sufficiency-of-the-evidence issues, this Court has made the following observation:

> The most significant and material evidence of defendant's guilt is his possession of the stolen property. Possession is a strong circumstance tending to show guilt and only slight corroborative evidence of other inculpatory circumstances is required.

*Newell v. State,* 548 P.2d 8, 13 (Wyo.1976). *See also Jansen v. State,* 892 P.2d 1131, 1137 (Wyo.1995).

■ In the present case, the State presented considerable evidence which demonstrated that, within a few days after the burglary, Sutherland possessed property that had been stolen from Norcross's home. In fact, Sutherland concedes that the State proved that he possessed the stolen property. Consequently, only slight corroborative evidence of other inculpatory circumstances had to be presented for Sutherland to be convicted of this burglary. We reiterate that circumstantial evidence and direct evidence possess the same standing and stature. *Lobatos v. State,* 875 P.2d 716, 719 (Wyo.1994).

■ The State insists that the evidence which was introduced at the trial, even though it was circumstantial, corroborated other inculpatory circumstances in such a way as to sustain the jury's conclusion that it was Sutherland who committed this burglary. This evidence included: Sutherland had been in Norcross's home a week to ten days prior to the burglary and had a chance to survey the contents of the home; Sutherland knew of the location and the contents of the tin box which had been opened; Sutherland could have become familiar with the latch on the window above the couch through which the burglar entered; Sutherland had the opportunity to commit the burglary since he knew the location of the residence and what was inside and since he was in Sheridan when the burglary occurred; Sutherland attempted to sell the property which had been taken from Norcross's residence; and Sutherland made several inculpatory statements which, when viewed together, supported the conclusion that he was the burglar.

Sutherland relies on *King v. State,* 718 P.2d 452 (Wyo.1986), to support his argument that the jury did not have sufficient evidence to convict him of this burglary. In *King,* the only evidence which was produced at the trial was that six burglaries had occurred and that some of the property which had been taken in the burglaries was found at King's residence. 718 P.2d at 453. This Court dismissed the charges against King because the prosecution had failed to produce sufficient evidence. 718 P.2d at 454.

Sutherland's reliance on *King* is misplaced. In that case, no corroborating evidence was introduced to link King to the burglaries other than the fact that his residence was located in the general area where the burglaries had occurred. 718 P.2d at 452–53. In this case, however, the prosecution presented ample corroborating evidence which, when

1. Section 6–3–301(a) provides:

(a) A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure or vehicle, or separately secured or occupied portion thereof, with intent to commit larceny or a felony therein.

2. Section 6–3–301(c)(i) provides:

(c) Aggravated burglary is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years, a fine of not more than fifty thousand dollars ($50,-000.00), or both, if, in the course of committing the crime of burglary, the person:

(i) Is or becomes armed with or uses a deadly weapon or a simulated deadly weapon[.]

considered with the fact that Sutherland possessed the stolen items, supported the jury's conclusion that it was Sutherland who burglarized Norcross's residence.

 Sutherland maintains that the State failed to prove that the burglar became armed with a deadly weapon because it did not introduce evidence which showed that ammunition had been taken or that either gun was loaded. The State argues that it did not have to prove that the stolen firearm was loaded in order to prove the elements of the aggravated burglary statute.

Sutherland relies on *Britt v. State*, 734 P.2d 980 (Wyo.1987). In that case, Britt and two companions broke into a gun shop and stole ten weapons and some ammunition. 734 P.2d at 980–81. One of the guns was loaded. 734 P.2d at 981. Britt argued that the guns were loot and that he did not intend to use them in the burglary. 734 P.2d at 981–82. He claimed, therefore, that he could not be found guilty of aggravated burglary. 734 P.2d at 982. We disagreed:

> Appellant seems to suggest that there is a meaningful distinction between possession of a deadly weapon and "armed with a deadly weapon." Under the circumstances of this case, however, there is no significant difference between being in possession and being armed.

*Id.* (footnote omitted). Sutherland directs our attention to the footnote that was at the end of the quoted paragraph which stated in part: "Arguably, under *some circumstances* (not present here), it might be appropriate to make a distinction between being in possession and being armed with a deadly weapon." 734 P.2d at 982 n. 1.

We cited *State v. Luna*, 99 N.M. 76, 653 P.2d 1222 (App.1982), with approval in our *Britt* opinion. 734 P.2d at 982. In *Luna*, the New Mexico court of appeals held that, when a person steals unloaded guns in a burglary, he is deemed to have armed himself with a deadly weapon. 653 P.2d at 1222.

Furthermore, Sutherland's argument seems to ignore the plain language of the aggravated burglary statute. The statute provides that a person who arms himself with a simulated deadly weapon in the course of

committing a burglary is guilty of aggravated burglary. Section 6–3–301(c)(i). We are convinced that, if the legislature intended for a simulated firearm which cannot fire to satisfy the statute, it intended for a real firearm, even when it is not loaded, to also satisfy the statute.

## B. Due Process

Sutherland contends that the trial court violated his due process rights by denying his request to hold the investigating officer subject to the subpoena after he completed his testimony in the State's case in chief.

 Pursuant to W.R.E. 611(a):

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

The scope and manner of examining witnesses are committed to the control of the trial court. *Lindsey v. State*, 725 P.2d 649, 656 (Wyo.1986). The trial court has wide discretion in controlling the mode and order of interrogating witnesses to effectuate an efficient and orderly trial process. *McCabe v. R.A. Manning Construction Co., Inc.*, 674 P.2d 699, 712 (Wyo.1983).

> A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did.

*Hilterbrand v. State*, 930 P.2d 1248, 1250 (Wyo.1997).

 At the end of the investigating officer's testimony in the prosecution's case in chief, the defense counsel requested that the officer be retained as a witness "just in case." The trial court allowed the defense counsel to exceed the scope of the direct examination but insisted that the witness be released from his subpoena, stating: "You know, some of this cross-exam is taking a really long time. I don't want people to have to wait

around any longer than they need to, so look at your book quickly; and if there's some more questions you want to ask of this witness, go ahead and do it, otherwise I'm going to release him."

Sutherland claims that the trial court violated WYO. STAT. § 1–11–205(a)(iii) (1997) by requiring him to complete his examination of the officer during the State's case in chief. The State correctly points out that this statute deals with the order of the proceedings for a civil trial and that it is not applicable to a criminal case. Instead, WYO. STAT. § 7–11–201 (1997) outlines the order of the proceedings for a criminal case. We must also consider our opinion in *Shaffer v. State*, 640 P.2d 88, 101 (Wyo.1982), where we said:

The order of trial set out in § 7–11–201, W.S.1977, should be followed so that an orderly presentation to the jury might be made, but it would come as a surprise to the Bar of this state if we were to hold that there could be no deviation from the order of trial set out in § 7–11–201, supra. It is necessary from time to time to take witnesses out of order so that parties or witnesses can be accommodated, or in the interests of justice. Lawyers find that it is not always possible to present evidence in the logical way set out in the statute. It has always been the practice in Wyoming to take witnesses out of order, provided it can be shown to the court that it is reasonably necessary. We believe that the trial court's determination to permit witnesses to testify out of order is a discretionary matter with the court, and should not be disturbed on appeal, unless it can be clearly shown that the trial court abused its discretion. The party who resists taking a witness out of turn has the burden to demonstrate that he has been prejudiced and that the trial judge has abused his discretion.

Sutherland has failed to show that the trial court abused its discretion in releasing the officer from his subpoena. The trial court was attempting to expedite the trial and to prevent harassment of witnesses by requiring Sutherland to finish his questioning of this witness. Although Sutherland categorizes this witness as a defense witness, we note that the only way the officer was on Sutherland's witness list was by being included in the general category of "[a]ny witness that the State may call." Sutherland did not specifically name the officer on his witness list nor did he subpoena the officer. When the trial court asked why the officer should not be released from the State's subpoena, Sutherland's counsel's response was vague:

Your Honor, in this case I'm not trying to detain; I'm just trying to—there were certain sets of circumstances that are leading up to how they come to the idea that my client did this burglary. [The investigating officer] may have some additional knowledge pertaining to something that I think—there's something about the tool that I—

Although Sutherland asserts that he was prevented from fully presenting his defense and deprived of a meaningful opportunity to present his defense, he fails to explain how he was prejudiced. Without knowing what questions Sutherland would have asked had he been able to recall the officer, we are unable to discern how his defense was prejudiced. We conclude, therefore, that the trial court did not err when it required Sutherland to examine the officer during the State's case in chief.

## C. Order in Limine

 Sutherland claims that the State violated the trial court's order in limine by introducing the statements which Sutherland made to the investigating officers. The State argues that Sutherland misstates the nature of the trial court's order and mistakenly attempts to apply that order to statements which were not covered by the order.

Before the trial, Sutherland filed a motion to suppress all the statements that he made to the police officers with regard to the charges against him. He asserted that such statements violated his "constitutional rights, including, but not limited to, the failure of law enforcement to read [him his] Miranda rights, or otherwise inform him of his right against self incrimination, and his right to be represented by counsel." At the hearing on the motion, Sutherland's counsel withdrew the motion but expressed his desire to have

**1164**

certain statements excluded from the State's case in chief. The trial court treated this request as a motion in limine and ordered the State not to present the following three statements:

1. "[Sutherland] told [the DCI agent] that if he was convicted of anything, he would be spending a long time in prison, so the officers will have to prove the case in Court."

2. "'If this happened and if [he] knew the items were stolen,' [Sutherland] would still be doing a long time in prison because of his prior record."

3. "[Sutherland] in an interview said, '. . . that no matter what he was charged with he would be spending a lot of time because of his prior record.'"

The trial court was concerned that the first statement referred to Sutherland's right to stand trial, concluding that this statement was potentially prejudicial to Sutherland and that it had little or no probative value. With regard to the second and third statements, the trial court found that these statements were more prejudicial than they were probative. The trial court explained, however, that the State might be able to offer the statements in rebuttal.

During the pretrial conference, Sutherland made another motion in limine to exclude the statements in which he referred to his potential criminal liability as an "accessory to dope and possibly interstate transportation of a stolen firearm." Sutherland also moved to exclude statements that he made regarding drug transactions. The State indicated that it did not intend to use those statements in its case in chief. The trial court ordered the State not to use the statements in its case in chief but warned Sutherland about the danger of "open[ing] the door to the introduction of those types of statements."

At the trial, the State called an agent from the Division of Criminal Investigation as a witness. The agent had interviewed Sutherland when he came to the police station at the agent's request. The agent testified:

I asked him if he would come in and talk to me. He said he would. He came down to the police department a short time later.

I advised him that he wasn't under arrest and that he was free to leave. He said he understood that.

I then advised him of the investigation I was working and asked him to talk to me about that. At that time he told me that he wasn't going to lie to me—and there was two other officers in the room—but he wasn't going to admit to anything, either. And I explained to him the people I had talked to and the evidence I had obtained and told him that I thought that the— indicated that he was responsible for doing the burglary.

He told me that, quote, "If this happened, I did not do the burglary." I explained to him that I wanted to find out who was responsible for the burglary and maybe something could be worked out regarding his responsibility if all he did was receive the property. He told me that he didn't want to be a rat and tell on anybody. And I explained that I could have the County Attorney's Office come down and talk to him about some kind of an agreement.

At some point he told me that if this happened, he already had the property before he found out that it was stolen; and he'd already dispersed some of it. When he finally did find out that it was stolen, had he known that the property was stolen, from who it was stolen from, he would have directed it back to Mr. Norcross.

I, once again, pointed out the information that I'd had; and eventually he told me that he was going to think about things; he was going to talk to someone else; and if he found out if this someone else had told the police the truth, then he would be back in to talk to me.

The following colloquy subsequently occurred between the prosecution and the agent:

Q All right. And the Defendant in his statements to you said that if this happened, he didn't do the burglary?

A That's correct.

Q And that if this happened he got the property before he realized it was stolen?

A That's correct.

Q And, further, he told you that if this happened he'd try to direct it back to Mr. Norcross?

A Had he known at the time where it was stolen from, he would have directed it back to Mr. Norcross.

The trial court precluded the State from introducing Sutherland's statement that "the officers will have to prove the case in Court" in its case in chief because this statement was potentially prejudicial to Sutherland and had little or no probative value. It also precluded the State from introducing Sutherland's statements regarding his prior record, him spending a long time in prison, his potential criminal liability as an "accessory to dope and possibly interstate transportation of a stolen firearm," and his drug transactions. The DCI agent did not go into any of the excluded topics during his testimony and, consequently, did not violate the orders in limine. The trial court, therefore, did not err by allowing the testimony into evidence.

## CONCLUSION

The trial court did not commit reversible error in this case.

Affirmed.