**John Franklin HENDERSON,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 97–275.**

Supreme Court of Wyoming.

March 4, 1999.

Walter A. Murray, Jr., Gillette, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General, Cheyenne, for Appellee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,\* JJ.

THOMAS, Justice.

The initial issue raised in this case is error by the trial court when it refused a motion by John Franklin Henderson (Henderson) to excise from the instructions to the jury any portion that explicitly or implicitly directed the jury to follow the law as given in the instructions of the court. The second issue attacks the sufficiency of the evidence to support the element of intent to defraud in the charged offenses, two counts of obtaining property by false pretenses in violation of Wyo. Stat. Ann. § 6–3–407(a)(i) (Michie 1997).[1] We hold that the trial court ruled correctly when it refused to edit the jury instructions to conform with Henderson's desires. We are also satisfied that there is ample evidence in the record to demonstrate the element of intent to defraud, both directly and by appropriate inference. The Sentence & Probation Order is affirmed in all respects.

In his Brief of Appellant, Henderson sets forth the issues in this way:

I.

Whether or not the trial court erred by denying Appellant['']s motion to strike those portions of the jury instructions which informed the jury that they must follow the law.

II.

Whether or not there was insufficient evidence to establish the element of intent on one or both of the counts charged.

In the Brief of Appellee, filed on behalf of the State of Wyoming, the same issues are restated in this way:

I. Did the district court err in instructing the jurors that they must follow the law in determining appellant's guilt?

II. Was sufficient evidence presented to sustain appellant's convictions for obtaining property by false pretenses?

The underlying facts are somewhat complex. They begin on March 22, 1993, when Henderson applied for a credit card with Signet Bank, using the name of John F. Henderson. His application was approved, and a credit card together with five courtesy checks, which could be used for making charges against the credit card account, were mailed to Henderson. The maximum credit limit authorized for that account was $400.00. On October 24, 1994, Henderson received the credit card and courtesy checks in Tulsa, Oklahoma.

During the next twenty months, Henderson received monthly statements for that credit card account. The monthly statements Henderson received included his current credit limit, which increased to $500.00 in May of 1996. The statements also reflected credit card charges incurred against the account and the amount of credit available to Henderson for future transactions. He consistently notified Signet Bank, and later Capital One Services, the successor of

---

\* Chief Justice at time of expedited conference; retired November 2, 1998.

1. Wyo. Stat. Ann. § 6–3–407(a)(i) provides, in pertinent part:

(a) A person who knowingly obtains property from another person by false pretenses with intent to defraud the person is guilty of:

(i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is five hundred dollars ($500.00) or more[.]

Signet Bank, of changes in his employment, mailing address and telephone number. Those changes included his relocation from Tulsa, Oklahoma, to Tucson, Arizona, and later to Gillette, Wyoming. In September of 1995, Henderson opened a checking account at Norwest Bank in Gillette, using the name of Franklin J. Henderson.

This summary brings us to the critical date of June 10, 1996, when Henderson wrote courtesy check number 103, drawn on the account of John F. Henderson at Signet Bank, Richmond, Virginia, in the amount of $3,800.00, and payable to F. Henderson. He presented this check on June 12, 1996, to Norwest Bank in Gillette, depositing $3,200.00 into the Franklin J. Henderson checking account, while, at the same time, obtaining $600.00 in cash. On June 11, 1996, Henderson issued courtesy check number 101, in the amount of $1,200.00, also payable to F. Henderson. He used this check to deposit $400.00 into the Franklin J. Henderson checking account at Norwest Bank on June 14, 1996, and he received $800.00 in cash on that occasion. Henderson endorsed these checks as Franklin J. Henderson prior to presenting them to Norwest Bank. At the time each of the checks was issued and presented to the Norwest Bank, Henderson's credit limit on the Signet Bank account was $500.00, and less than $100.00 of that amount was available for him to utilize.

Courtesy check number 103 was returned to Norwest Bank on June 17, 1996, for insufficient funds. Because the check was also stamped "endorsement canceled,"[2] the $3,800.00 was immediately charged back to Henderson's checking account at Norwest Bank, resulting in a substantial overdraft in the account. Notice of the returned check and the overdraft were sent to Henderson's address in Gillette that same day. On June 20, 1996, courtesy check number 101 was also returned to Norwest Bank. That check indicated, however, that Henderson had stopped payment on it, rather than allowing it to be rejected due to insufficient credit in the account on which it was drawn. As had occurred with courtesy check number 103, the full amount was charged back to Henderson's checking account at Norwest Bank, and written notice immediately sent to Henderson advising him of the overdraft.

For several months, Henderson did nothing to cover the overdrafts with the exception of an attempt in early September to settle the account for ten percent of the amount owed. Norwest Bank closed Henderson's checking account, and, a short time later, Norwest Bank referred Henderson's account to the Credit Bureau of Casper for collection. Because of the amounts involved, the circumstances surrounding those checks and their return, and Henderson's failure to reimburse Norwest Bank for the overdraft amount, Norwest Bank also contacted an officer of the Gillette Police Department.

The investigation by the police officer resulted in obtaining a copy of an Arizona driver's license issued to Franklin J. Henderson, which had been used as identification in opening the Norwest Bank checking account. The police officer also obtained a copy of an Oklahoma driver's license issued to John Franklin Henderson, a copy of a Wyoming driver's license issued to John F. Henderson, and the bank records from both Norwest Bank and the account at Capital One Services. The information from those records disclosed that Henderson was the holder of the driver's licenses and the owner of the bank accounts, although discrepancies appeared with respect to Henderson's date of birth and social security number. The investigation by the Gillette Police Department culminated in the filing of criminal charges against Henderson of two counts of obtaining property by false pretenses in violation of Wyo. Stat. Ann. § 6–3–407(a)(i).

Henderson was tried by a jury beginning on May 19, 1997, and the jury found him guilty of both counts of the Information. At trial, Henderson acknowledged that he was the holder of the various driver's licenses and that the bank accounts were his. He admitted writing the checks in question, present-

2.  "Endorsement canceled" indicates that the endorsement is not good, and that the check will not be honored by the drawee bank.

ing them to Norwest Bank, and obtaining cash back in connection with those transactions. Henderson also admitted he knew the checks had been returned, but he never attempted to repay Norwest Bank for its losses until September 1996, when the checks were turned over to the Credit Bureau of Casper for collection. Henderson also acknowledged that, at the time of trial, he had not fully reimbursed Norwest Bank for the amount of the returned checks.

In the meantime, on April 30, 1997, Henderson filed a motion requesting the trial court strike all portions of the proposed jury instructions which directed the jury, either explicitly or implicitly, to follow the law in reaching its verdict. Henderson's argument was that the jury had an absolute right to disregard the law in arriving at its verdict, and that any jury instruction to the contrary violated that right and was contrary to "the law of the land." The trial court summarily denied that motion.

Upon conviction, Henderson was sentenced to concurrent terms of imprisonment of four to six years; fined $500.00 on Count I and $750.00 on Count II; assessed surcharges to the Crime Victim's Compensation Fund of $250.00 and $500.00, respectively; and ordered to pay restitution to Norwest Bank for the losses incurred. The trial court suspended execution of Henderson's prison sentence, and imposed a split sentence consisting of sixteen days in county jail followed by six years of supervised probation. Henderson has appealed from the Sentence & Probation Order.

Henderson contends the trial court erred when it instructed the jury that: "It is your duty to follow the law as I instruct and to decide all questions of fact submitted to you." Further, he attacks portions of another jury instruction which states: "I will now instruct you on the law you must apply. It is your duty to follow the law." The argument presented by Henderson in support of this claim that the trial court erred when it denied his motion to strike those portions of the jury instructions which explicitly or implicitly instruct the jury to follow the law is simply a variation on the theme of jury nullification.

In *Nollsch v. City of Rock Springs,* 724 P.2d 447, 449–50 (Wyo.1986), we spoke to the notion of jury nullification in this way:

Nollsch argues, however, that in denying him a jury trial the municipal court abrogated his right to have the jury nullify the ordinance as applied to him. The unreviewable power of a jury to acquit even in the fac[e] of overwhelming evidence of guilt, sometimes described as jury nullification, long has been recognized and accepted as an integral and essential aspect of our criminal jury system. *Bushell's Case,* 6 Howell's State Trials 999 (1670); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *United States v. Dougherty,* 473 F.2d 1113, 1136 (D.C.Cir.1972); *Lessard v. State,* Wyo., 719 P.2d 227 (1986). In recognizing the concept, however, other courts have announced the generally accepted rule that jury nullification is not a right enjoyed by a defendant in a criminal case. *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *United States v. Wiley,* 503 F.2d 106 (8th Cir.1974); *State v. Skuse [Skuse v. State],* Alaska.App., 714 P.2d 368 (1986); *Medley v. Commonwealth,* Ky., 704 S.W.2d 190 (1985); *People v. St. Cyr,* 129 Mich.App. 471, 341 N.W.2d 533 (1983); *State v. Perkins,* Minn., 353 N.W.2d 557 (1984); *State v. Maloney,* 126 N.H. 235, 490 A.2d 772 (1985); *State v. Champa,* R.I., 494 A.2d 102 (1985). Nollsch had no right to jury nullification and that concept does not require that he be afforded a jury trial in contravention of the clear provisions of Rule 5(d), W.R.Cr.P.J.C..

■ When a verdict appears to have been " 'the result of compromise, or of a mistake on the part of the jury,' " it " 'cannot be upset by speculation or inquiry into such matters.' " *Lessard v. State,* 719 P.2d 227, 231 (Wyo.1986) (*quoting State v. Hickenbottom,* 63 Wyo. 41, 178 P.2d 119, 127 (1947)). Jury nullification may occur for whatever reason. Even though we accept that proposition, we have held consistently that jury nullification is not a right enjoyed by a defendant in a criminal case. *Nollsch,* 724 P.2d at 449–50. The United States Court of Appeals for the Seventh Circuit explained the proposition in this way: "It [the jury] has the *power* to

acquit on bad grounds, because the government is not allowed to appeal from an acquittal by a jury. But jury nullification is just a power, not also a right." *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir.1988) (emphasis in original).

▮ This acknowledged power of the jury to return a "not guilty" verdict and not uphold the law does not lead to the conclusion that the "jury must be informed by the judge of that power." *United States v. Dougherty*, 473 F.2d 1113, 1136 (D.C.Cir. 1972). Our rule is that the trial court has a duty to instruct the jury on the law applicable to the case before it. *Baier v. State*, 891 P.2d 754, 756 (Wyo.1995); *Collins v. State*, 854 P.2d 688, 700 (Wyo.1993); *Evans v. State*, 655 P.2d 1214, 1218 (Wyo.1982). The same rule is reflected in federal law. *Sparf v. United States*, 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *United States v. Grismore*, 546 F.2d 844, 849 (10th Cir.1976). The state has an interest in the application of the correct law to the facts by the jury, and that interest can only be sustained when the jury is properly instructed on the law. In this instance, the jury instructions which were given were appropriate, and it would have been error for a judge to instruct the jury to disregard the law.

The ageless reasoning articulated by the United States Supreme Court is apropos:

> Public and private safety alike would be in peril, if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court * * *.

*Sparf*, 156 U.S. at 101, 15 S.Ct. 273. The potential of harm to an accused if the court were not to instruct the jury to follow the law is significant. Henderson believes that the jury would feel more free to acquit him of a crime that it believed he had committed, but the jury also might feel more free to determine that it need not follow any legal propositions. We are confident that Henderson would not want the jury to disregard instructions that dealt with the burden of proof beyond a reasonable doubt; required the jury to deliberate without prejudice; or advised the jury not to decide the case until both sides have completed the submission of their evidence.

Henderson cites cases, which he asserts approve of jury nullification in criminal cases. He quotes from *State of Georgia v. Brailsford*, 3 Dall. 1, 3 U.S. 1, 4, 1 L.Ed. 483 (1794); *Dougherty*, 473 F.2d at 1136; *Horning v. District of Columbia*, 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920); and *United States v. Moylan*, 417 F.2d 1002, 1006 (4th Cir.1969), *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). Each of the quotes that Henderson relies upon are taken out of context. So, for example, in *Horning*, 254 U.S. at 138, 41 S.Ct. 53, the United States Supreme Court uttered dictum to the effect that the judge always has the right and duty to tell the jury what the law is upon the facts which must be judged. All of the circuit courts of the United States which have addressed this issue have ruled that jury nullification is not a right available to a criminal defendant. The United States Court of Appeals for the Fourth Circuit stated the proposition in this way: "However, this is not to say that the jury should be encouraged in their 'lawlessness * * *.'" *Moylan*, 417 F.2d at 1006. The court in *Moylan* decided that district judges should guard against jurors making rulings based on their prejudices. Examples of courts in other states that have spoken unfavorably with respect to jury nullification are *Medley v. Com.*, 704 S.W.2d 190, 191 (Ky.1985); *People v. St. Cyr*, 129 Mich.App. 471, 341 N.W.2d 533, 534 (1983); *State v. Perkins*, 353 N.W.2d 557, 561–62 (Minn.1984); *State v. Maloney*, 126 N.H. 235, 490 A.2d 772, 775 (1985); and *State v. Champa*, 494 A.2d 102, 106 (R.I.1985). The rationale set forth in these cases is almost as persuasive as our own well-settled law.

Instruction about jury nullification, or on the other hand the excising of instructions that the jury is to follow the law, is not a right afforded to a criminal defendant in this state or elsewhere. There is no reason to overturn the long-settled rule that the jury should be instructed to follow the law. The jury instructions given in this case were eminently correct, and there was no error in giving them.

■ We then turn to Henderson's issue attacking the sufficiency of the evidence to establish the element of intent required by the charges against him. We review the sufficiency of the evidence by examining the record in the light most favorable to the state. *Bloomquist v. State,* 914 P.2d 812, 823–24 (Wyo.1996), followed in *Sutherland v. State,* 944 P.2d 1157, 1160–61 (Wyo.1997); *Martinez v. State,* 943 P.2d 1178, 1182 (Wyo. 1997); and *Harris v. State,* 933 P.2d 1114, 1123 (Wyo.1997). " 'We will not substitute our judgment for that of the jury * * *.' " *Sutherland,* 944 P.2d at 1160 (*quoting Bloomquist,* 914 P.2d at 823–24). We examine the evidence only to the extent that permits us to determine whether a panel of reasonable individuals could reach the result based upon the evidence before them. *Sutherland,* 944 P.2d at 1160 (*quoting Bloomquist,* 914 P.2d at 823–24). In this instance, we discern ample evidence justifying the finding of the jury that Henderson had the requisite intent to defraud when he presented the checks in question.

■ Under Wyo. Stat. Ann. § 6–3–407(a)(i), the State was charged with the burden of establishing beyond a reasonable doubt that Henderson knowingly obtained $500.00 or more by false pretenses with the requisite intent to defraud. We summarized briefly the evidence from the trial that demonstrated the opening of an account at Norwest Bank, in September 1995, by Henderson using the name Franklin J. Henderson; a false and erroneous social security number; and an incorrect birth date. There is no question that the credit card account, against which the courtesy checks presented to the jury were written, had a maximum credit limit of only $500.00. That account was under Henderson's real name, John F. Henderson. Henderson received monthly statements of his account, clearly setting forth the credit limit, from Signet Bank and, later, Capital One Services.

Henderson wrote two courtesy checks on the credit card account far exceeding his credit limit. He made those checks payable to his alias, Franklin J. Henderson, in whose name the account at Norwest Bank had been opened. He signed those checks using his true name, John F. Henderson, but he endorsed them as Franklin J. Henderson. In each instance when he presented those checks to Norwest Bank, he obtained cash in excess of $500.00. He purportedly deposited the remainder of this transaction in his account, with Norwest Bank immediately crediting that account. Further, Henderson made no attempt to reconcile these overdrafts when notified. Only when the account was referred to a collection agency did Henderson begin making payments on the overdrafts he had created.

■ The jury had before it evidence of Henderson's use of various names on the checking accounts; his dealings with two banks; the utilization of different dates of birth; the utilization of different social security numbers; and checks that were presented when clearly there was not enough credit available to cover them. It is true that there is no evidence of express statements or admissions by Henderson that he intended to defraud Norwest Bank. The jury can find the requisite intent through reasonable inferences from circumstantial evidence. *Lopez v. State,* 788 P.2d 1150, 1153 (Wyo.1990). The rule, as we have expressed it, is that the state of mind of a defendant can be inferred from his acts, his conduct, his words, and other circumstances in the case. *Schiefer v. State,* 774 P.2d 133, 135 (Wyo.1989). If the requisite intent to defraud could not be inferred from circumstantial evidence, it often would be impossible to establish that intent, because those intent on defrauding others are not likely to tell the victims what their intentions are at the time of the criminal act.

In this case, the jury was instructed that it would have to find Henderson had the requisite intent to defraud another person, and find that intent beyond a reasonable doubt, in order to find him guilty of either or both counts of the crimes charged. The trial court instructed the jury that intent to defraud is:

[A]n intent to deceive another person for the purpose of gaining some material advantage over him or to induce him to part with property or to alter his position to his injury or risk, and to accomplish that purpose by some false statement, false pre-

tense, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive.

In light of the facts of this case, the jury instructions correctly and adequately informed the jury with respect to the element of intent to defraud.

We are satisfied, based upon our review of the record, that a reasonable jury could find that Henderson wrote the courtesy checks with the requisite intent to defraud Norwest Bank. It is clear that he wanted Norwest Bank to believe that the checks were drawn upon funds which were available and could properly be drafted against. The evidence was not only sufficient, it broaches upon being overwhelming.

The Sentence & Probation Order is affirmed in all respects.